**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United Air Ambulance LLC, | No. CV-17-04016-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Cerner Corporation, et al., | |
| Defendants. | |

Pending before the Court are Cross-Motions for Summary Judgment. Defendants Cerner Corporation and the Health Exchange Incorporated filed a joint Motion for Summary Judgment and corresponding Statement of Facts on April 10, 2019. (Doc. 67, "DMSJ"; Doc. 68 "DSOF".) Plaintiff United Air Ambulance filed its own Motion for Summary Judgement and Statement of Facts later that day. (Doc. 73, "PMSJ"; Doc. 74, "PSOF".) Both Plaintiff and Defendants responded to the opposing motion for summary judgment and corresponding statement of facts. (Doc. 83, "Defendants' Resp."; Doc. 84, "Resp. to PSOF"; Doc. 88, "Plaintiff's Resp."; Doc. 89, "Resp. to DSOF".) Likewise, both Plaintiff and Defendants filed Replies. (Doc. 90, "Defendants' Reply"; Doc. 91, "Plaintiff's Reply".) Oral argument was held on November 18, 2019. The Court considers the parties respective pleadings and enters the following Order:

## I.     BACKGROUND

K.M., a twenty-three-month-old child with an extremely rare bowel disorder, was rushed to the Phoenix Children's Hospital ("PCH") emergency room ("ER") on the

morning of March 21, 2017.  (PSOF ¶ 12.)  After treatment in the ER, K.M.'s parents faced a decision: (1) admit the child to PCH for continued treatment of the emergent condition afflicting their son, "a possible line infection," or (2) depart on a pre-arranged air ambulance flight to Boston Children's Hospital ("BCH") to address the underlying medical condition which PCH could not treat and under which K.M. had long suffered. They chose the latter.  This case is about who pays for that flight.  More precisely, this case concerns whether Cerner Corporation ("Cerner") and its fellow defendants abused their discretion in approving the medical necessity of K.M.'s flight at the pre-authorization stage but later denying United Air Ambulance's ("UAA") claim.

**A. K.M.'s Medical Needs**

  PCH was familiar with K.M.'s medical conditions—short bowel syndrome, secondary to necrotizing enterocolitis in early infancy and parenteral nutrition associated liver disease ("PNALD")—when he arrived at the ER on March 21, 2017.  (PSOF ¶ 1.) PCH physicians attempted to address K.M.'s complicated medical problems many times in the past, but multiple surgical treatments had largely failed to improve his condition. (PSOF ¶ 3.)    The physicians believed, but could not confirm, that a lack of intestinal musculature complicated K.M's condition and stymied PCH's attempted treatment. (PSOF ¶ 5.)  Lacking the required specialized diagnostic equipment, K.M.'s doctors referred him to BCH, one of the few hospitals with the equipment needed to properly diagnose and treat him. (PSOF ¶ 6.)  Cerner approved a second opinion from Dr. Tom Jaksic at BCH for a duodenal mobility study that required inpatient admission. (Doc. 82-1 at 67.)

  The problem was getting there. Because K.M. was completely reliant on parenteral nutrition and suffered severe peristomal erosion around the central line supplying him vital nutrients, he needed hourly dressing changes to prevent further erosion and possible infection.  (PSOF ¶ 4; Doc. 82-1 at 69, "Dr. Carey Letter")  Dr. Andrew Carey, the Associate Medical Director at BCH's Center for Advanced Intestinal Rehabilitation supported transport to BCH by air ambulance, concluding that "the degree of peristomal erosion and the frequency of dressing changes required to prevent further skin breakdown

and soiling of his sterile central venous line site" made "commercial air flight . . . not appropriate for this patient." (Dr. Carey Letter.) K.M.'s condition was both rare and serious.[1] Dr. Carey continued:

> Recent pathology suggests a segmental absence of intestinal musculature . . . an incredibly rare diagnosis [that] requires the use of antroduodenal and colonic manometry to detect for abnormalities in peristalsis. This testing requires inpatient level of care and is only available at a select group of centers, of which Boston Children's Hospital is one. . . . Failure to seek further diagnostic testing will result in ongoing limitations in his ability to advance enteral nutrition which will accommodate progression of his liver disease. Progressive PNALD represents a major source of mortality in patients with intestinal failure and requires specialized care to reduce risk of death.

(*Id.*) Dr. David Notrica, a pediatric surgeon at PCH, corroborated Dr. Carey's medical opinion and recommendations. (Doc. 82-1 at 73.) He affirmed K.M. "needs an evaluation at [BCH] . . . as soon as possible, and will need medical transport to get there." (*Id.*) With physicians at both PCH and BCH concluding that ground transportation was inadequate and instead recommending travel by air ambulance, K.M.'s parents arranged transport with UAA.[2]

On the day of his scheduled flight, K.M. experienced what both parties consider a "medical emergency" and was taken to the PCH ER for treatment. (PSOF ⁋ 12; Doc. 82 at 47.) PCH treated K.M. for a "possible line infection" and potential sepsis. (PSOF ⁋ 13.) As Dr. Carey and Dr. Notrica previously established, PCH could not treat K.M.'s underlying condition. (PSOF ⁋⁋ 11-14.) PCH could, however, successfully address K.M.'s most pressing medical needs—the line infection and possible sepsis. (*See* DSOF ⁋⁋ 44-45.) Both K.M.'s pediatric gastroenterologist and ER physician thus recommended that K.M. be admitted at PCH and not take the UAA flight. (*Id.*; PSOF ⁋ 13.) But fearing another opportunity to fly K.M. by air ambulance for treatment at BCH would not come, K.M.'s

---

[1] Cerner recognized the complexity of K.M.'s condition and assigned a case manager from American Health Holding ("AHH") to coordinate his care. (DSOF ⁋ 34.)
[2] Cerner received Dr. Carey and Dr. Notrica's Letters of Medical Necessity "on or about February 20, 2017." (DSOF ⁋ 37.)

mother signed K.M. out of the PCH ER against medical advice. (PSOF ¶¶ 11-14.) Upon arrival in Boston, BCH directly admitted K.M. and successfully treated his gastrointestinal conditions. (PSOF ¶ 15.)

**B. The Plan**

Defendant Cerner is a health care technology company that offers insurance coverage for employees. (DSOF ¶ 3.) Through its legal subsidiary and third-party benefits administrator, Defendant The Health Exchange, Inc. d/b/a Cerner HealthPlan Services ("CHPS"), Cerner offers a comprehensive benefits package called the Wraparound Benefits Plan.[3] (DSOF ¶ 9.) Among other offerings, the Wraparound Benefits Plan provides medical insurance coverage to Cerner employees and beneficiaries under a component plan, the Health*e* Options Component Plan ("the Plan"). (DSOF ¶ 10.) Both plans are governed by the Employee Retirement Security Act of 1974 ("ERISA"). (DSOF ¶ 12.) K.M. is a covered beneficiary under the Plan. (DSOF ¶ 11.) The Plan names Cerner as fiduciary and plan administrator as defined by ERISA and grants Cerner "the exclusive power and authority, in its sole discretion, to construe and interpret the Plan, to determine all questions of Plan coverage and eligibility for benefits, the methods of providing or arranging for such benefits and all other related matters." (DSOF ¶ 14.) In turn, Cerner delegates administration and payment of claims to CHPS. (DSOF ¶ 15.) Cerner and CHPS thus maintain a close working relationship. (*See* DSOF ¶¶ 27-32.) In return for its services, Cerner pays CHPS a monthly administration fee on a per employee covered basis and provides funds to be paid out by CHPS on a weekly basis. (DSOF ¶¶ 29-31.) CHPS operates out of a Cerner-owned building in a commercial building campus that Cerner also calls home. (DSOF ¶ 27.) Employees at CHPS maintain email accounts with Cerner and CHPS. (PSOF ¶ 56.)

The Plan covers ambulatory travel, including by air ambulance, in specific circumstances. (DSOF ¶¶ 16-17.) Generally, the Plan reimburses transportation by air ambulance in medical emergencies when ground transportation is not appropriate either

---

[3] For purposes of clarity, this Order refers to Cerner and CHPS in their individual capacities and, collectively, as "Defendants."

because a patient needs treatment immediately or because nearby facilities cannot offer appropriate treatment. (*See* DSOF ⁋ 16.) In relevant part, the Plan reads:

> Coverage is provided for air ambulance transport for medical emergencies in the following circumstances:
>
> - The Participant requires transport to a hospital or from one hospital to another because the first hospital does not have the required services and/or facilities to treat the Participant; and ground transportation is not medically appropriate because of the distance involved,
> - Or because the Participant has an unstable condition requiring medical supervision and rapid transport

(*Id.*) The provision requires a provider notify Cerner "except in life threatening circumstances." (*Id.*) The Plan does not define "medical emergencies." (*See* Doc 68-4 at 51-59.) The Plan also explicitly disclaims coverage in a range of other circumstances. This provision, titled "Services Not Covered," reads in part:

> Any treatment, confinement, or service which is not recommended by, or any operation which is not performed by, an appropriate professional provider; Examination by a Doctor, related laboratory tests, x-rays and vaccines performed in the absence of specific symptoms on the part of the Participant (except as may be specifically provided herein).

(DSOF ⁋ 17.)

### C. The Claims Process

To be compensated, a provider of services must file a claim with Cerner. The claims process here entailed navigating seven layers of review. (*See* DSOF ⁋⁋ 18-26.) Broadly speaking, this claim passed through two main categories of review: preauthorization and claim processing. The Plan allows health care providers to request preauthorization for providing a service to a Plan beneficiary.[4] (DSOF ⁋ 17.) When denied, a preauthorization request may be appealed twice. (DSOF ⁋ 19.) The first appeal is evaluated by CHPS, the second by Cerner itself. Specifically, if CHPS denies a providers' initial appeal, the dispute is elevated to one of two Cerner personnel charged with handling second level appeals—Bogorad and Dr. David Nill review final claims on appeal among their other

---

[4] CHPS regularly refers to preauthorization requests as "predetermination" requests in correspondence, using the terms interchangeably.

responsibilities. (DSOF ℙ 23.) Regardless of whether a preauthorization request is approved or denied, a provider must file a formal claim for benefits. (DSOF ℙ 20.) Like preauthorization requests, claims may be appealed twice if denied. (DSOF ℙ 21.) Similarly, claim appeals are first reviewed by CHPS, then by Cerner. (DSOF ℙℙ 21-23.)

To insulate the process from conflicts, Cerner and CHPS have some procedural safeguards. The first claim appeal accords no deference to the original decision. (DSOF ℙ 24.) Instead, decisions are made "by an individual who did not decide the initial claims, and who is not a subordinate of anyone that decided the initial claim." (*Id.*) The second appeal follows the same procedures. (DSOF ℙℙ 24-26.) At both appeal levels, the reviewer can consider new information submitted by a claimant and consult a health care professional experienced in the relevant area if necessary. (DSOF ℙℙ 24-26.) If denied after a second appeal, a claimant may request an "External Review." (DSOF ℙ 26.) Denial of a claim after a second appeal, or, if an external review is requested, confirmation of denial by an external reviewer, renders a claim judgment final. Once a final adverse benefits decision has been rendered and a provider exhausts all remedies available under the Plan, the provider may bring a civil action under ERISA.

In this case, UAA submitted both a preauthorization request and filed a formal claim, following the procedures detailed above. This process began with a series of initial inquiries with CHPS by K.M.'s AHH case manager. (DSOF ℙ 35.) On February 9, 2017, K.M.'s AHH case manager asked CHPS if the Plan covered K.M.'s travel expenses for a second opinion at BCH. (*Id.*) Eleven days later, AHH confirmed that BCH's services were medically necessary, but not covered because they were not emergent. The next day, February 21, 2017, UAA called CHPS to inquire into covered costs for air ambulance. (DSOF ℙ 39.) Quoting the Plan language, *supra*, UAA was told the Plan only covered travel by air ambulance, like that requested, in "medical emergencies" and any coverage was subject to the terms of the Plan. (DSOF ℙℙ 39-40.) On February 28, 2017, CHPS followed-up on the previous phone call and provided AHH written confirmation that coverage for air ambulance was not covered for K.M.'s second opinion at BCH. (DSOF ℙ

41.) Despite this, UAA transported K.M. to Boston on March 21, 2017, (PSOF ⁋ 14.), and sent CHPS a preauthorization request later that day. (DSOF ⁋ 46.) That request was denied on March 24, 2017 for the reasons previously given. UAA appealed on April 24, 2017; CHPS upheld the denial on May 15, 2017. (Doc. 82-7 at 82.) This May 15 appeal denial again quoted the Plan language, (DSOF ⁋ 53), but also explained that K.M.'s requested air ambulance did not meet plan requirements because (1) "he was not requiring rapid transport for a medical emergency" and (2) "he was not inpatient requiring transport from one facility to another for additional services not available at the initial hospital." (DSOF ⁋ 52.)

UAA appealed a second time on July 17, 2017. On the second preauthorization appeal Cerner reversed its' initial denial. Cerner sent UAA a "certification of medical necessity" affirming the services were "medically necessary but not a guarantee of payment." (Doc. 82-2 at 6.) This certification letter reminded UAA that all payment determinations were made after a claim was submitted and remained "subject to the terms and limitations of the benefit plan including deductible and/or copayments." (*Id.*) The certification was thus "pertinent only if the member has an active policy and premiums are paid up through the time of service." (*Id.*) Although the letter "only certifie[d] the medical necessity of the services listed above under the terms of the Plan" it is unclear what practical significance, if any, the letter has on any later claim determination.[5] (*Id.*) At this point, Cerner directed Stratos, a third-party retained to negotiate claim reimbursement between Cerner and providers, to engage UAA. Stratos negotiated a reimbursement of $600,000 with UAA but disclaimed the agreement was a guarantee of payment. (Doc. 82-1 at 3.) UAA signed and returned this "Provider Agreement" on August 24, 2017. (Doc. 82-1 at 63.)

---

[5] Presumably, the certification affirms that UAA's transport of K.M. to BCH was "medically necessary" as defined in the Plan. (Doc. 68-4 at 55.) The Plan defines "Medically Necessary" as: commonly recognized by appropriate medical specialists, within standards of good practice; appropriate, effective and consistent with the diagnosis or treatment of an illness or injury; the appropriate supply or level of service that can be safely administered; provided by a hospital or Covered provider; and a drug or supply approved by the U.S. Food and Drug Administration. (*Id.*)

UAA filed a formal claim on August 30, 2017.  (DSOF ₱ 60.)  On September 1, 2017, Cerner received PCH medical records from K.M.'s March 21, 2017 ER visit prior to the UAA flight.  (DSOF ₱ 61.)  The PCH records revealed that K.M. was signed out against the medical advice of K.M.'s pediatric gastroenterologist and ER doctor recommending admission to PCH.  (DSOF ₱ 62.)  The physicians determined K.M. was suffering from an emergent condition that could be treated successfully at PCH recommended against transport. (*See id.*)  CHPS denied UAA's claim on September 13, 2017.  (DSOF ₱ 63.)  UAA appealed the initial claim denial on October 12, 2017, noting CHPS' prior finding that the requested service was medically necessary.  CHPS denied this first appeal on October 26, 2017 for the same reasons it denied the initial claim.  On December 21, 2017 UAA appealed once more.  Cerner again denied. (DSOF ₱ 73.)  In the January 26, 2018 decision, Ms. Bogorad, Cerner's claim administrator and final authority for claim determinations on secondary appeal, held "[a]t no point in time did the air transport services provided by UAA qualify for coverage under the Plan." (DSOF ₱ 77.) In denying UAA's claim a final time, Cerner asserted that air ambulance was not covered because K.M.'s underlying condition was non-emergent, K.M.'s emergent condition—sepsis—could be treated at PCH, and the March 21 UAA flight was taken against the medical advice of PCH physicians.  (DSOF ₱ 77.)  The denial letter emphasized Cerner's previous certification of that UAA's services were medical necessary was "not enough to trigger coverage for air transport services," because coverage was conditioned on satisfaction of all the Plan terms. (DSOF ₱ 78.)  In short, "medically necessary" did not mean "covered."

UAA requested an Independent External Review ("IER").  After deeming an IER appropriate, CHPS retained AHH to conduct the IER. (DSOF ₱₱ 80-82.)  AHH reviewed submissions from both parties and affirmed the denial of UAA's claim.  (DSOF ₱ 85.)  In fact, the IER went further.  The IER rebutted Cerner's previous certification of medical necessity and concluded that not only were air ambulance services not covered by the Plan, they were not medically necessary.  (DSOF ₱ 86.)  The IER found additional grounds to deny UAA's claim "since it is not documented that the claimant was taken to the closest

facility capable of providing the needed services." (DSOF ¶ 86.)  This is the first mention of a proximity requirement in the administrative record.

## II.    LEGAL STANDARD

The Employment Retirement Income Security Act ("ERISA") "governs the administration of employer-provided benefit pension plans." *Metro. Life. Ins. v. Parker*, 436 F.3d 1109, 1111 (9th Cir. 2006).  ERISA requires plan administrators, as fiduciaries, to administer their plans "in accordance with the documents and instruments governing the plan insofar as the documents and instruments are consistent with the provisions of [ERISA]." 29 U.S.C. § 1104(a)(1)(D).

Courts review the denial of ERISA benefits de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When a plan "unambiguously provide[s] discretion to the administrator", the standard of review shifts from the default, de novo, to abuse of discretion. *Abatie v. Alta Health and Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (9th Cir. 1989); *see also, Met. Life Ins. Co. v. Glenn*, 554 U.S. 105, 110-11 (2008).  "Under the abuse of discretion standard of review, 'the plan administrator's interpretation of the plan will not be disturbed if reasonable." *Day v. AT&T Disability Income Plan*, 698 F.3d 1091,1096 (9th Cir. 2012) (quoting *Conkright v. Frommert*, 559 U.S. 506, 512 (2010)).  "ERISA plan administrators abuse their discretion if they render decisions without any explanation, . . . construe provisions of the plan in a way that conflicts with the plain language of the plan or rely on clearly erroneous findings of fact." *Day*, 698 F.3d at 1096.  Under the abuse of discretion standard, a court considers "whether application of a correct legal standard was '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (quoting *United States v. Hickson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)).[6]

---

[6] In an ERISA benefits case, the traditional summary judgment standards are not necessarily appropriate. Fed. R. Civ. P. 56. When, as here, a plan adminstrator's

A reviewing court should weigh any conflict of interest or procedural irregularity as a factor in its review. *Glenn*, 554 U.S. at 108. When "the entity that administers the plan . . . both determines whether ran employee is eligible for benefits and pays benefits out of its own pocket," a conflict of interest is created. *Id.* "A conflict of interest is a factor in the abuse-of-discretion review, the weight of which depends on the severity of the conflict." *Demer v. IBM Corporation LTD Plan*, 835 F.3d 893, 900 (9th Cir. 2016). Even in the face of a conflict, "a deferential standard of review remains appropriate." This does not mean that plan administrators automatically prevail on the merits, only that a plan administrator's interpretation of the plan "will not disturbed if reasonable." *Conkright v. Frommert*, 559 U.S. 506, 512 (2010) (citation and quotation omitted). Similarly, "when a plan administrator's actions fall so far outside the strictures of ERISA that it cannot be said that the administrator exercised the discretion that ERISA and the ERISA plan grant, no deference is warranted." *Abatie*, 458 F.3d at 972. Alternatively, "[w]hen an administrator can show that it has engaged in an ongoing, good faith exchange of information between the administrator and the claimant, the court should give the administrator's decision broad deference notwithstanding a minor irregularity." *Id.* (internal quotation marks and citations omitted). But "deference" is not a "talismanic word that can avoid the process of judgment." *Salomaa*, 642 F.3d at 673 (quoting *Glenn*, 554 U.S. at 118). "The nature and scope of the alleged violations will significantly affect the standard of review applied by the district court." *Hoffman v. Screen Actors Guild Prod. Pension Plan*, 757 Fed. Appx. 602, 604 (9th Cir. 2019).

A reviewing court should also consider procedural errors in deciding whether a plan administrator abused its discretion. *See Salomaa*, 642 F.3d at 674. Among other procedural irregularities, inconsistent reasons for denial and evidence of malice are rightly considered. *Id.* "A small procedural irregularity is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion, just as a court would weigh

_____

determination is reviewed for abuse of discretion, "a motion for summary judgment is merely a conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material facts exists, do not apply." *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

a conflict of interest." *Horton v. Phoenix Fuels, Co., Inc.*, 611 F.Supp.2d 977, 986 (D. Ariz. 2009). "Procedural violations of ERISA do not alter the standard of review unless those violations are so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm." *Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 985 (9th Cir. 2005).

## III.  DISCUSSION

### A. Conflict of Interest and Standard of Review

The Plan unambiguously confers discretionary authority to Cerner as administrator. *See Abatie*, 458 F.3d at 963 (finding abuse of discretion the proper standard of review when an "ERISA plan unambiguously grant[s] discretion to the administrator."). More precisely, the Plan names Cerner as fiduciary and plan administrator as defined by ERISA and grants Cerner "the *exclusive* power and authority, in its *sole discretion*, to *construe and interpret the Plan, to determine all questions of Plan coverage* and eligibility for benefits, the methods of providing or arranging for such benefits and all other related matters." (DSOF ¶ 14 (emphasis added)).  Both parties agree that the abuse of discretion standard applies to this Court's review of Cerner's conduct. (DMSJ at 9; PMSJ at 13.)  Both likewise concede that Cerner, by funding and administering the Plan, has a structural conflict of interest. (DMSJ at 10; PMSJ at 11.)  They disagree as to what weight, if any, this Court should accord that conflict.

UAA asks the Court to accord greater weight to Cerner's conflict of interest above the "higher degree of skepticism" normally applied in such cases. *Salomaa*, 642 F.3d at 666.  UAA's argument is highly speculative. First, UAA makes multiple, unsubstantiated claims—that Ms. Bogorad wears "multiple hats," that claim reimbursements affect her budget for the other departments in her purview—to infer she has financial incentive to deny claims.  UAA is correct that Cerner has a structural conflict of interest generally. Cerner tasks a wholly-owned subsidiary, CHPS, with determinations and payments of claims on the Plan.  Bogorad is not immune from that conflict. The record does not demonstrate that that the budget for claims determinations is any way intermingled with

any other general funds. (*See* DSOF ¶¶ 29-32.) Second, aside from basic money-saving incentives operative in the claim decisions of every plan administrator, UAA points to no credible evidence that financial incentives infected the claims process here. UAA correctly notes that CHPS and Cerner are co-located and maintain open lines of communication evidenced by dual email accounts. (Doc. 84 at ¶ 56.) But this relational closeness only bolsters the existence of Cerner's structural conflict of interest. Given the obvious, legitimate explanations for the close working relationship, this does not warrant overly exacting scrutiny. Cerner's conflict of interest demands additional skepticism within the abuse of discretion review, but its claim determinations are not presumptively suspect because CHPS and Cerner have relational closeness expected of a parent and subsidiary.

On the other hand, Defendants believe the conflict of interest deserves no weight. (DMSJ at 10.) They argue UAA's failure to identify how the alleged conflict of interest influenced the process in this case obviates the need for additional scrutiny beyond the abuse of discretion standard. (Doc. 83 at 3-6.) That is, the existence of a structural conflict of interest only merits a "higher degree of skepticism" when a party points to a specific example where the alleged conflict influenced the dispute. Defendants position imposes an improper burden of proof on plaintiffs unsupported by controlling case law.[7] *Salomaa* is instructive. The lack direct evidence that a conflict affected the claims process is unsurprising in ERISA cases. *Salomaa*, 642 F.3d at 676 (determining that because the record usually does not disclose direct evidence of an insurance company's conflict—like claims-handling history in other cases or internal directives to claims managers in how to evaluate claims—"we are ordinarily ignorant of much of what we are supposed to weigh."). In ERISA cases, courts do not require direct evidence a conflict of interest manifestly affected the outcome of a case. Rather, conflicts of interest justify a court's "additional skepticism" because of the unique incentives of ERISA's statutory scheme. *Id.*

---

[7] Although a plan administrator should be granted "broad deference notwithstanding a minor irregularity" when "an administrator can show it has engaged in an ongoing, good faith exchange of information [with] the claimant," the Court finds no case that willfully ignores an *actual* conflict of interest merely because the administrator *appears* to have operated in good faith. *See Abatie*, 458 F.3d at 972.

- 12 -

Specifically, ERISA gives insurance companies "special protection . . . against claims," increasing the "incentive to be more unfair . . . because [they] cannot be subjected to the punitive damages for bad faith that are the bogeymen of insurance companies." *Id.* Regardless of whether UAA proves the conflict of interest affected Cerner's decision-making here, the incentives inherent in ERISA cases remain unchanged and require a court review with additional skepticism. *See Demer*, 835 F.3d 893, 903 ("[T]he lack of such specific evidence does not mean that there is *no* conflict of interest.") (emphasis in original). The Court accordingly reviews Cerner's conduct under the deferential abuse of discretion standard, but with the additional skepticism required by Cerner's structural conflict of interest.

## B. Procedural Irregularities

With Cerner's conflict of interest established, the Court analyzes the two main stages of the claims process—preauthorization and claim—to weigh the significance of any procedural irregularity. Like a conflict of interest, procedural irregularities can "reduce[] the deference owed to an administrator's decision to deny benefits" and heighten judicial scrutiny. *Abatie*, 458 F.3d at 972 (citing *Fought v. UNUM Life Ins. Co. of America*, 379 F.3d 997, 1006 (10th Cir. 2004)). "A more serious procedural irregularity may weigh more heavily." *Id.* As discussed below, the record does not suggest "wholesale and flagrant violations of the procedural requirements of ERISA" that necessitate de novo review, but the steady drum of procedural irregularities adds weight to Cerner's conflict of interest and undermines the credibility of their claim denial justifications. *Id.* at 971.

### a. Preauthorization

Defendants initial denial of UAA's preauthorization request was reasonable. Admittedly, CHPS provided little explanation for their denial of UAA's initial preauthorization request.[8] More was not needed. The terse denial simply quoted the relevant Plan provision, explaining that "air transport *for a second opinion* is not a covered benefit under the plan." (DSOF ℙ 41) (emphasis added). CHPS italicizes "medical

---

[8] The email follows multiple recorded phone conversations with UAA. All uniformly communicated UAA's services were not covered under the Plan. (DSOF ℙℙ 28-41.)

emergencies" in the quoted plan language to seemingly infer that second opinions do not fall in that prerequisite category. (DSOF ⁋ 41.) Notably, this denial came on the heels of multiple recorded phone conversations consistently explaining Defendants position. While not verbose, this initial interpretation was a reasonable lay interpretation of the Plan's plain language.

Problems surface in Defendants handling of the first appeal from the denial of this preauthorization request. On first appeal, CHPS affirmed the initial denial and offered a slightly more detailed, but confused explanation. Interpreting the Plan language, CHPS supports the initial preauthorization denial with two apparently independent justifications: (1) K.M. "was not requiring rapid transport for a medical emergency"; and (2) "*he was not inpatient* requiring transport from one facility to another for additional services not available at the initial hospital." (Doc. 82-2 at 4) (emphasis added). This misconstrues the Plan's plain language. *See Day*, 698 F.3d at 1096. The Plan logically reads to provide air ambulance coverage in two general circumstances—neither require inpatient status.[9]

CHPS's first justification reasonably interprets the Plan's plain language.[10] The second justification blatantly misreads the plain language of the Plan to require "inpatient" status.[11] The provision clearly states otherwise. The provision covers "transport *to a* hospital *or* from one hospital to another." (DSOF ⁋ 16) (emphasis added). There is nothing in the language to require inpatient status. A denial of coverage premised upon such

---

[9] Notably, CHPS's interpretation at this stage directly conflicts with Cerner's later interpretations at the claims stage, (DSOF ⁋ 77), and with their pleadings before this Court. (*See* DMSJ at 12.)

[10] CHPS's explanation of the Plan seemingly replaces an "unstable condition requiring medical supervision"—the Plan language detailing one of the two instances where air ambulance travel is covered—with "medical emergency", the language from the provision's prefatory clause. The relevant Plan language provides "coverage . . . for medical emergencies [when] the Participant has an unstable condition requiring medical supervision and rapid transport." (DSOF ⁋ 16.) It is unclear whether CHPS merely confused the two terms, consciously defined "medical emergencies" as "unstable conditions requiring medical supervision", or unartfully held that coverage under the provision was simply not triggered because although K.M. appeared to need medically supervised transport, he did not require *rapid* transport.[10] Despite the confused explanation, because K.M.'s underlying condition was considered "stable"—and thus, not a "medical emergency" or "unstable condition requiring medical supervision"—reasonable grounds for denial existed.

[11] This gross misreading of the plain language of the plan is found in numerous communications at multiple levels of claims processing at both Cerner and CHPS.

misreading is precisely the type of "illogical," "implausible" interpretation that qualifies as an abuse of direction. *Salomaa*, 642 F.3d at 676 ; *see also Day*, 698 F.3d at 1096. ("ERISA plan administrators abuse their discretion if they . . . construe provisions of the plan in a way that conflicts with the plain language of the plan").

On second appeal, Cerner reversed the denial of UAA's preauthorization request, and instead, certified the medical necessity of UAA's air ambulance services. Cerner tries to pin this reversal on UAA. They argue UAA misrepresented K.M.'s medical status by selectively disclosing health records excluding PCH's March 21st ER records where two doctors' recommended against the UAA flight. But this does not explain Cerner's drastic interpretive pivot. It is worth establishing what Cerner knew at this decision point. An email chain between Bogorad and K.M.'s case manager demonstrates Cerner knew the following: (1) Travel by air ambulance was considered medically necessary by Dr. Notrica at PCH and Dr. Carey at BCH; (2) K.M.'s underlying condition was "stable" and "non-emergent"; (3) on the day of transport, doctors at PCH wanted to admit K.M. to treat possible sepsis; (4) PCH could successfully treat K.M. for sepsis but not his underlying condition; (5) K.M. was signed-out of the PCH ER against medical advice. (Doc 82-4 at 6-8.) The email chain also includes an initial negotiated estimate for UAA's services of $39,865.[12] (Doc 82-4 at 8.) Even if UAA's selective disclosure of medical records caused Cerner to believe K.M. "require[d] rapid transport for a medical emergency" at the time of the UAA flight, at no point do the medical records indicate that K.M. was "inpatient." Cerner denied the first preauthorization appeal because the Plan required K.M. to be inpatient status. Both the administrative record and Bogorad's deposition demonstrate Cerner knew K.M. was outpatient at the time of the UAA flight. (*See* Doc. 82-4 at 6, 8.) UAA's selective medical records disclosure cannot create a record of K.M. being inpatient. The record contains no meaningful explanation for these changing interpretations. Neither do Defendants pleadings. The Court finds Defendants attempt to blame the anomaly on UAA unavailing.

---

[12] Prior to the initial denial of UAA's formal claim, this estimate would balloon to $600,000. (Doc. 82-1 at 63.)

### b. The Claim

The problems continue at the claims stage. Cerner quickly backtracked from approving UAA's preauthorization request and denied both UAA's formal claim and, eventually, both appeals. Cerner denied UAA's first level appeal for two reasons: (1) air ambulance services were not recommended by an "appropriate provider"[13]; and (2) the record did not support an "emergent need" that required "air ambulance transport . . . from one hospital to another." (Doc. 82 at 48-49.) Each justification is problematic.

First, as to (1), Defendants now argue the Dr. Notrica and Dr. Carey letters recommending treatment at BCH and transport by air ambulance do not qualify as "recommendations from appropriate providers" because they address K.M.'s underlying bowel condition, not the emergent sepsis that would trigger coverage.[14] (Defendants' Reply at 6.) That K.M.'s underlying bowel condition does not qualify as a "medical emergency" under the Plan may be a rational reading, but the treatment of Dr. Notrica and Dr. Carey's recommendations raises an eyebrow. Particularly in circumstances like K.M.'s, where a chronic non-emergent condition increases the likelihood of emergent events identical to the one K.M. suffered on March 21, 2017, consideration of such recommendations seems appropriate.[15] The denial letter does not attempt to parse the emergent and non-emergent

---

[13] Cerner did not previously rely on this justification when considering UAA's preauthorization request and related appeals.

[14] The nuanced argument Defendants make at the pleading stage is largely absent from the administrative record. (*See* Defendants' Reply at 6.) The First Appeal denial letter cites only the recommendations against transport made by K.M.'s PCH gastroenterologist and emergency room physician on the day of the UAA flight. (Doc. 83 at 44-46.) Dr. Carey and Dr. Notrica's earlier recommendations are not considered. (Id.) In examining ERISA claims, the Ninth Circuit has applied the "general rule that 'an agency's order must be upheld, if at all, on the same basis articulated in the order by the agency itself,' not a subsequent rationale articulated by counsel." *Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1104 (9th Cir. 2003) (quoting *Fed. Pow. Comm'n v. Texaco, Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974)). The Court will do so here.

[15] Defendants do not contest that because of his underlying, chronic condition—PNALD—K.M. "has had multiple central line associated blood stream infections (CLABSI), which also represents a major source of mortality in patients with intestinal failure." (Dr. Carey Letter.)

aspects of K.M.'s condition or their corresponding recommendations. Instead, Cerner makes no mention of Dr. Carey's recommendation and includes only a small excerpt— three fragmented sentences emphasizing the "second opinion" language—from Dr. Notrica's letter. Defendants argue that, being made one month prior to treatment, the doctors' recommendations "cannot be reasonably considered recommendations for treatment on March 21, 2017." (Defendants' Reply at 6.) Here, however, Cerner's refusal to consider the earlier recommendations undermines the reasonableness of their review. As recommendations for treatment of a longstanding, chronic condition the medical opinions carry more presumptive validity over time than a prescription for passing malady. Dr. Notrica and Dr. Carey recommended treatment and travel by air ambulance to address a chronic condition that still afflicted K.M. on March 21, 2017. Combined with the complexity of K.M.'s condition, the recommendations merited consideration. By recommending costly medical treatment requiring a cross-country flight, the letters implicitly contemplate that some passage of time is likely before treatment at BCH given the significant logistical hurdles, long travel, and the potential for immediate treatment upon arrival.

Second, as to (2), Defendants denial of UAA's first claim appeal identifies two distinct requirements to qualify for coverage—the patient must suffer a "medical emergency" and also require "air ambulance transport . . . from one hospital to another." The first requirement, permitting coverage only in "medical emergencies," is explicitly supported by the plain language. (*See* DSOF ⁋ 16.) However, the Plan leaves "medical emergencies" undefined. (*See* Doc 68-4 at 51-59.) In their pleadings, the parties argue over the proper definition of "medical emergency."[16] (Plaintiff's Resp. at 8; Defendants'

---

[16] Defendants offer definitions from medical dictionaries to conclude that medical emergencies necessarily include a sense of urgent need and that "a chronic condition, no matter its severity, is not an emergency." (Defendants' Reply at 6.) A lay interpretation of emergency supports Defendants position. On the other hand, UAA rejects this interpretation and contends that K.M.'s emergent condition—sepsis—is inextricably tied to his chronic condition—PNALD. (Plaintiff's Resp. at 8.) Because the medical emergency here directly arose from his chronic PNALD, coverage for air ambulance is warranted. (*Id.*)

Reply at 6.)  Both parties' arguments have merit.[17]  But in examining ERISA claims, the Ninth Circuit applies the "general rule that 'an agency's order must be upheld, if at all, on the same basis articulated in the order by the agency itself,' not a subsequent rationale articulated by counsel." *Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1104 (9th Cir. 2003) (quoting *Fed. Pow. Comm'n v. Texaco, Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974)).  Despite the reasonableness of Cerner's present interpretation, a post-hoc rationalization of what constitutes a "medical emergency" is of limited probative value in evaluating their justification for claim denial at this stage.  The Plan does not define "medical emergency." (*See* Doc 68-4 at 51-59.) Neither does Cerner's order. (*See* Doc. 82-1 at 21-24.) Cerner's determination at first level appeal merely quotes the Plan language without explanation, then denies UAA's appeal. (*Id.*)  Hardly a model of clarity, this communication certainly does not explain Cerner's reversal and Plan interpretation "in a manner calculated to be understood by the claimant." *Saffon*, 522 F.3d at 870 (quoting *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).

Additionally, Defendants interpretation of the Plan here is inconsistent with their prior interpretation at the preauthorization stage.  At the preauthorization stage, both Bogorad and Dr. David Nill, the individuals charged with final claims determinations, knew K.M. sought UAA's services a "non-emergent" condition on March 21, 2017.  They knew, on "[t]he day of transport, he was ill but the acute care he needed could have been provided, like many times in the past, by Phoenix Children's." (Doc. 82-4 at 8.)  They reversed the preauthorization request denial anyway.  As mentioned previously,

---

[17] Defendant's interpretation possibly leads to somewhat perverse results. The arbitrary categorization of chronic conditions as "non-emergent" and sudden illness as "emergent" rapidly breaks down as the severity of a chronic condition increases. Consider a patient has a chronic condition like K.M.'s, but with a nearly 100% mortality rate. This chronic condition, when untreated, likely leads to emergent events that increase in both severity and regularity over time. Under Defendants Plan interpretation, the patient could only qualify for air ambulance coverage in medical emergencies. But, given that the Plan arbitrarily separates the emergent events that stem from the chronic condition, the patient would never be covered for necessary transport by air ambulance if local hospitals are unable to treat the chronic condition. Medical insurance does not offer limitless coverage, but such arbitrary interpretation acts like a death sentence.

Defendants attempt to blame their reversal on UAA's provision of selective medical records is unavailing. Given that Defendants do not define "medical emergency" *at any point* in the review process, the reversal at the preauthorization stage indicates inconsistent Plan interpretation at a minimum. Applying the additional skepticism required by Cerner's conflict of interest, this inconsistency casts reasonable doubts on the claim process. *See Nolan v. Heald College*, 745 F.Supp.2d 916, 926 (N.D. Cal. 2010) ("[F]ailure to distinguish a contrary . . . determination, failure to explain the evidence necessary to make a successful appeal and selective use of evidence are all factors that support 'giving more weight to the conflict.'") (quoting *Glenn*, 128 S. Ct. at 2352).

UAA points to increased cost of its services to explain Defendants about-face from preauthorization approval. (PMSJ at 13.) The price of UAA's services jumped from a $40,000 initial estimate to a $600,000 negotiated cost. (Doc. 82-1 at 3.) Cerner was undeniably aware of the increased cost. (Doc. 82-1 at 3.) While no evidence indicates that Cerner relied upon or considered cost in denying UAA's claim, the dramatic cost increase stands out as of the only factual distinctions between preauthorization request approval and claim denial. Standing alone, the inference that Cerner may have considered cost does not merit finding an abuse of discretion. However, in light of the other procedural irregularities and structural conflict, the effect of the cost differential merits consideration.

Comparing the information available to Cerner when overturning the preauthorization request denial with the information on hand at claim denial reveals two important differences. First, the increased cost of UAA's services is significant and was unknown when preauthorization was granted. Second, at the claim stage Cerner now had the complete medical reports from PCH and statements of K.M.'s PCH pediatric gastroenterologist and ER physician recommending admission to PCH and against transport to BCH. It is unclear what, if any, determinative information Cerner learned from these reports that it did not have available at the second preauthorization appeal. At that earlier stage, Cerner understood K.M. could be treated at PCH but was signed-out against medical advice. Based on Defendants' stated Plan interpretation, this alone was sufficient

to deny coverage.  Although the two PCH physicians' statements provide more detail, the fundamental information later used to justify claim denial—that K.M. was signed out against medical advice of doctor's at PCH—was always available.  Bogorad infers as much.  At deposition, Bogorad could not identify what specific facts from the PCH medical records informed Cerner's reversal, instead stating the "additional information . . . gave us more transparency" and the "medical records [were] much more nuanced."  (Doc. 81-4 at 12).

Cerner's review of UAA's second claim appeal largely rolls-up all the previous arguments made to support claim denial in one comprehensive summary. Unsurprisingly, Cerner minimizes, selectively cites, or entirely omits adverse evidence in similar manner to that detailed above.

## IV.    CONCLUSION

### a.  Summary Judgment

In an ERISA benefits denial case, a district court "is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." *Abatie*, 458 F.3d at 969.  This case asks whether an ERISA plan administrator with a conflict of interest dutifully reviewed a provider claim for a child with complex, interrelated medical conditions—some chronic, some emergent; some covered, some not. Examining the "actual reasons stated by the [plan administrator]," reveals Defendants engaged in a concerted effort to find valid reason to deny UAA's claim.  *Pannebecker v. Liberty Life Ass. Co. of Boston*, 542 F.3d 1213 (9th Cir. 2008). In this case, Defendants interpretation of an undefined term, "medical emergencies", is central.  In review of UAA's preauthorization request and claim, Defendants largely relied on other grounds to justify denial. When invoked, Defendants failed to communicate a consistent interpretation of "medical emergencies" to apprise UAA of evidence necessary to make a successful appeal. Defendants vacillate between interpreting the Plan reasonably and inexplicably. They construed "provisions of the plan in a way that conflicts with the plain language of the

plan," *Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005), interpreted the Plan inconsistently, failed to "distinguish a contrary . . . determination," *Nolan*, 745 F.Supp.2d at 926, failed "to explain the evidence necessary to make a successful appeal," *id.*, and selectively used evidence to insulate their decisions. In total, Defendants offered five distinct justifications to deny UAA's claim at different stages of the review process. Defendants denials grew more forceful after the quoted claim cost went from $40,000 to $600,000. The reasonableness of the plan administrator must be judged skeptically because here, "the plan acts as judge in its own cause." *Boyd*, 410 F.3d at 1178. Considering Defendants conduct with the appropriate skepticism, the Court finds the litany of procedural irregularities erode Defendants credibility to sufficiently undermine the stated reasons for denying coverage. Thus, the Court holds Defendants abused their discretion in review of UAA's claim.

### b. Attorneys' Fees Award

UAA moves for attorneys' fees under 29 U.S.C § 1132(g)(1). (PMSJ at 17.) ERISA permits district courts to award reasonable attorney's fees and costs to either party. *See* 29 U.S.C § 1132(g)(1). "A plan participant who prevails in an action to enforce rights under the plan is ordinarily entitled to a reasonable attorney's fee if the participant 'succeed[s] on any significant issue in litigation which achieves some of the benefit . . . sought in bringing the suit' and if not special circumstances make an award unjust." *Barnes v. Independent Auto. Dealers of Cal. Health & Welfare Benefit Plan*, 64 F.3d 1389, 1397 (9th Cir. 1995) (quoting *Losada v. Golden Gate Disposal Co.*, 950 F.2d 1395, 1401 (9th Cir. 1991)). To fully assess the award of attorneys' fees, the Court requires Plaintiff submit a motion and supporting documentation seeking costs and attorney's fees in accordance with LRCiv. 54.1 and 54.2, Rules and Practice Civil, District of Arizona.

Accordingly,

**IT IS ORDERED** Defendant's Motion for Summary Judgment (Doc. 67) is **DENIED**.

**IT IS FURTHER ORDERED** Plaintiff's Motion for Summary Judgment (Doc.

73) is **GRANTED**.

   **IT IS FURTHER ORDERED** that Plaintiff may submit the required memorandum and supporting documentation of attorney fees within 30 days of the of this Order.

   **IT IS FURTHER ORDERED** the Clerk of the Court shall terminate this action and enter judgment accordingly.

   Dated this 4th day of December, 2019.

Honorable Susan M. Brnovich
United States District Judge